IRVING, J.,
for the Court.
¶ 1. Elmer Dabney filed a petition to controvert, alleging that he had received a snakebite on September 1, 1992, while in the course and scope of his employment with Texas Gas Transmission Company. On January 25, 1995, a hearing was held before an administrative law judge, and the administrative law judge found that Dabney had a compensable injury as a result of the snakebite. The administrative law judge awarded temporary total disability benefits from September 1, 1992, to and including September 13, 1993, at the rate of $227.18 per week. She also ordered fifty-two and one-half weeks of permanent partial disability benefits, at the same weekly rate, based upon a thirty percent impairment rating of the lower extremity and a maximum medical improvement date of September 13, 1993. The administrative law judge further ordered Texas Gas and Liberty Mutual Insurance Company, its workers’ compensation carrier (Texas Gas/Liberty Mutual), “to provide medical services and supplies as required by the nature of [Dabney’s] injury and the process of his recovery therefrom-” The order of the administrative law judge was entered on July 17, 1995. Texas Gas/Liberty Mutual appealed the administrative law judge’s decision to the Full Commission which, on March 15, 1996, affirmed the order of the administrative law judge. Texas Gas/Liberty Mutual did not appeal the decision of the Full Commission. Therefore, the Full Commission’s March 15, 1996 order became final and binding upon Texas Gas/Liberty Mutual.
¶ 2. Over three years later, on May 7, 1999, Dabney filed a motion with the Mississippi Workers’ Compensation Commission seeking to reopen the case and to compel the payment of a medical bill in the amount of $1,135.99 from Neurology Clinic, P.A. On May 7, 2002, a hearing was held before an administrative law judge. On September 11, 2002, the administrative law judge held that the immunoglobulin treatment rendered by Dr. Charles A. Cape of the Neurology Clinic was medically necessary and ordered Texas Gas/Liberty Mutual to provide “[m]edical treatment, services and supplies ... for such period as [Dabney’s] injury and the process of [Dabney’s] recovery may require, specifically including the immunoglobulin treatment recommended by Dr. Cape and now tendered by Dr. O’Brien.... ” However, the administrative law judge did not award additional benefits for temporary total disability or permanent partial disability.
¶ 3. Thereafter, Dabney filed a motion to amend the opinion of the administrative law judge to include additional benefits. This motion was denied, and both Dabney and Texas Gas/Liberty Mutual appealed to the Full Commission. The Full Commission affirmed in toto the order of the administrative law judge. Texas Gas/Liberty Mutual appealed to the circuit court, and Dabney filed a cross-appeal. The Circuit Court of DeSoto County affirmed the decision of the Full Commission.
¶ 4. Texas Gas/Liberty Mutual has now appealed the decision of the circuit court, asserting the following issues: (1) whether the order of the Full Commission should be overruled because there is no expert scientific or medical evidence which proves by a reasonable degree of medical probability that Dabney’s condition of peripheral *1082 poylneuropathy was caused by a copperhead snakebite, and (2) whether Dabney suffers from pre-existing diseases or unrelated medical conditions which are medically recognized causes of neuropathy and, if so, whether Dabney proved a direct causal relationship between his current medical condition of peripheral polyneuro-pathy and the incident of a copperhead snakebite. Texas Gas/Liberty Mutual also argues that the evidence was insufficient to support the findings of the Full Commission that Dabney’s current medical condition of polyneuropathy was caused by copperhead snake venom. Texas Gas/Liberty Mutual further argues that Dabney’s current medical treatment of injection of immunoglobulin drugs is not medically reasonable and necessary for his diagnosis of mild polyneuropathy.
¶ 5. Dabney has cross-appealed, asserting that the Full Commission was in error in not awarding additional temporary total disability or permanent partial disability benefits.
FACTS
¶ 6. Dabney was employed by Texas Gas for twenty-four years as an electrical specialist. On September 1, 1992, Dabney became ill while at work and was transported from work to Baptist Memorial Hospital-DeSoto. He was admitted for cardiac evaluation and diagnosed with hypertensive crisis with chest pain and possible transient ischemic attack. However, Dabney testified that he was hospitalized because he was bitten that day by a snake, supposedly a copperhead, while in the course and scope of his employment with Texas Gas.
¶ 7. Dabney took an early retirement in May or June of 1995, when he was fifty-nine years old. Dabney testified that his supervisor, Jerrell Wheat, gave him the option to perform a job making clerk’s pay or take an early retirement and that early retirement was the most viable option.
¶ 8. Currently, Dabney’s principal treatment is immunogloblin treatment which stimulates the nerves and reduces the pain. Dabney testified that he will have to continue the immunoglobulin treatment for the rest of life. Dabney has numerous medical conditions including gastrectomy, anemia, a severe fibula break, left ankle fracture, an injury to the left knee and an injury to the left wrist requiring surgery, rotator cuff surgery resulting in residual arthritic conditions, degenerative disc disease resulting in back surgery, a cardiovascular condition resulting in several heart attacks, osteomyelitism, and stroke.
¶ 9. Dabney was treated by various physicians including Dr. Tom Morris, Dr. Cape, and Dr. Malcolm Baxter.[1] On October 13, 1992, Dabney was treated by Dr. Morris, orthopedic surgeon, for either an insect or snakebite on the left calf. Dr. Morris treated Dabney because Dabney had an area of cellulitis secondary to the snakebite which was in an area of his leg where he had experienced a previous orthopedic procedure on the fibula. Dabney was admitted to the hospital for intravenous antibiotics and possible drainage of the left leg. Dabney stayed in the hospital two days and was discharged with cellulitis with abscess formation.
¶ 10. After several treatments with antibiotics, the cellulitis resolved itself. Dr. Morris stated that on January 4, 1993, when Dabney complained of chest pain, *1083 the leg infection had been resolved. On May 19, 1993, Dabney went to the emergency room with a tender and swollen left leg and was admitted to the hospital and followed for several days but released with a determination of bacteria cultured for drainage. Dabney had a relapse on August of 1993 that was treated the same way. Dr. Morris never treated Dabney for polyneuropathy.
¶ 11. Dr. Malcolm Baxter, Jr., board certified family practitioner in Hernando, Mississippi, testified that he had treated Dabney and his family’ since 1987 and last saw Dabney on July 9, 2001. Dr. Baxter treated Dabney for a snakebite that Dab-ney reported on September 1, 1992. Dr. Baxter testified to a reasonable degree of medical certainty that the neuropathy that Dabney suffers is secondary to the snakebite. The bases of Dr. Baxter’s opinions are (1) the literature on snake venom indicates that snake venom contains neurotox-ins, (2) neurotoxins affect nerve function, (3) Dabney did not have neural problems prior to the snakebite but since the snakebite he has had all kinds of neuropathy type pain, and (4) infection in the area can affect nerves in the area. In this regard, Dr. Baxter testified that Dabney “had a draining sinus from his leg that took forever to heal.”
¶ 12. Dr. Baxter testified to a reasonable degree of medical certainty that Dab-ney’s peripheral polyneuropathy could be contributed to by Dabney’s gastrectomy and inability to absorb B-12, but Dr. Baxter could not testify to a percentage of contribution. Dr. Baxter also testified that Dabney’s diabetes has contributed to Dabney’s polyneuropathy, but Dr. Baxter again could not testify to a percentage of contribution. Dr. Baxter stated that he referred Dabney to Dr. Cape.
¶ 13. Dr. Cape, an expert in the field of neurology, testified by deposition that he first saw Dabney on October 27, 1995, for numbness of the lower extremities from which Dabney had suffered for three years. Based on Dabney’s history of snakebite, Dr. Cape performed nerve condition tests, which were abnormal; EMG tests, which were normal; and Shillings and other diagnostic testing to arrive at the cause of Dabney’s lower extremity numbness. Based on his evaluations and neurologic examinations, Dr. Cape opined that Dabney suffered from peripheral po-lyneuropathy secondary to the snakebite and autoimmune disease resulting from the snakebite. Dr. Cape testified that Dabney reached maximum medical improvement in May of 1997.
¶ 14. Dr. Cape testified that Dabney’s polyneuropathy currently causes numbness distally in the arms and legs, greater in the legs with primary sensory loss in the feet. Dr. Cape testified to a reasonable degree of medical probability that the polyneuropathy was precipitated in Dab-ney by the snakebite and that the polyneu-ropathy is going to be permanent in nature. Dr. Cape stated that based on the AMA Guidelines to Permanent Impairment, that Dabney had a five percent permanent medical impairment to the body as a whole in October of 1999. Dr. Cape testified that the medical treatment that Dabney will require in the future will cost in excess of $7,500 per month in immuno-globulin therapy, diagnostic testing, physician care and drugs. Dr. Cape also testified that there are no objective tests to apply in order to prove that the neuropa-thy is caused by the snake venom and that there are other causes of autonomic neuro-pathy, but the general implication is snakebite.
¶ 15. Dr. Fredrick B. Carlton, a board certified physician in internal medicine, emergency medicine and toxicology, testified that he seriously questioned whether *1084 or not Dabney was bitten by a snake. Dr. Carlton stated that the evidence is nonexistent to support a snakebite on September 1, 1992. Dr. Carlton’s opinion was based on his experience in treating snakebites over the years, extensive review of literature, and researching peripheral neu-ropathy. Dr. Carlton testified that a copperhead bite to the leg is generally the least serious of all snakebites and that it is uncommon to have systemic symptoms from copperhead bites.
¶ 16. Dr. Carlton stated that occasionally with significant envenomation there will be nausea, vomiting, hypertension, weakness, and dizziness. Dr. Carlton stated that he treats individuals with copperhead bites with antivenin and that determining the course of progression determines whether antivenin treatment is necessary. Dr. Carlton stated that in his opinion one rarely needs to treat a copperhead bite in the lower extremity with antivenin and that the basic treatment for a copperhead bite to the lower extremity is to elevate the extremity. Dr. Carlton stated that pain is the hallmark of the envenomation with the copperhead bite and that it is incredibly uncommon for copperhead bites to produce systemic symptoms.
¶ 17. Dr. V.V. Vedanarayanan, a pediatric neurologist at University Medical Center, testified that based on the medical records that he evaluated, Dabney does not have autoimmune polyneuropathy, and at best Dabney may suffer from a mild sensory polyneuropathy, which may be caused by low levels of vitamin B-12 secondary to the gastrectomy, alcohol exposure for vitamin deficient individual, abnormal glucose tolerance, and swelling in the area of the injured fibula. Dr. Veda-narayanan testified that intravenous im-munoglobulin is an improper treatment for polyneuropathy. Dr. Vedanarayanan further testified that the treatment should be discontinued and that Dabney would not worsen as a result.
¶ 18. Mr. Terry L. Vandeventer, a field associate in herpetology at the Museum of Natural Science in Jackson, has studied herpetology (the study of reptiles and amphibians) for over forty-five years. Vande-venter testified that copperheads and pit vipers have only a minimal impact on the nerve system of a bitten individual. Van-deventer further testified that snakes, other than pit vipers which venom impacts the nerve system, are not normally in existence in north Mississippi. Vandeventer further testified that normal recovery is expected from copperhead bites.
¶ 19. The administrative law judge acknowledged that Dr. Carlton and Dr. Ve-danarayanan testified persuasively (1) that Dabney’s neuropathy would be the first case known in the world in which a snakebite caused neuropathy, (2) that Dabney does not have autoimmune polyneuropathy and may have a mild sensory polyneuropa-thy, (3) that Dabney has other medical conditions that could have contributed to the polyneuropathy and that immunoglo-bulin intravenously is an improper treatment for Dabney’s current condition.
¶ 20. However, the administrative law judge also found that neither Dr. Carlton nor Dr. Vedanarayanan had ever examined Dabney, while Doctors Morris, Baxter, and Cape had treated Dabney for years. Because of this, the administrative law judge found the testimony of Doctors Morris, Baxter, and Cape to be more reliable and compelling than the testimony of Doctors Carlton and Vedanarayanan. She also found that there was no direct or significant evidence to a reasonable degree of medical certainty that Dabney’s polyneuro-pathy is secondary to one of Dabney’s many medical conditions which pre-existed the snakebite. Further, she discounted the testimony of Mr. Vandeventer, finding *1085 that his testimony substantially addressed an issue that had been decided in the initial hearing.
STANDARD OF REVIEW
¶ 21. The standard of review which we must employ in this case is well established:
The standard of review in workers’ compensation cases is limited. The substantial evidence test is used. The Workers’ Compensation Commission is the trier and finder of facts in a compensation claim. This Court will overturn the Workers’ Compensation Commission decision only for an error of law or an unsupported finding of fact. Reversal is proper only when a Commission order is not based on substantial evidence, is arbitrary or capricious, or is based on an erroneous application of the law.
Weatherspoon v. Croft Metals, Inc., 853 So.2d 776, 778(¶ 6) (Miss.2003). “The claimant bears the burden of proving by a fair preponderance of the evidence each element of the claim.” International Paper Co. v. Greene, 773 So.2d 399, 401(¶ 4) (Miss.Ct.App.2000).
ANALYSIS AND DISCUSSION OF THE ISSUES
¶ 22. Although Texas Gas/Liberty Mutual has listed several issues, all of the issues may be collapsed into one issue: whether there is substantial evidence to support the Commissions’s finding that Dabney’s current condition of polyneuro-pathy was caused by the snakebite that he suffered in 1992, and if so, whether the immunoglobulin treatment, which Dabney is expected to have to take indefinitely, is medically reasonable and necessary for his diagnosis of mild polyneuropathy. Therefore, we collapse the issues and discuss them accordingly.
¶ 23. Texas Gas/Liberty Mutual maintains that the testimony of Dr. Cape and Dr. Baxter is not supported by medical or scientific proof but is merely based on Dabney’s subjective medical history with no supporting medical or scientific authority. Texas Gas/Liberty Mutual contends that Dr. Cape did not perform any test that linked the occurrence of polyneuropa-thy with a copperhead snakebite and offered no basis for his opinion of causation other than a temporal relationship between the onset of polyneuropathy and the snakebite. Texas Gas/Liberty Mutual maintains that its experts, Dr. Carlton, who routinely treats snakebite patients, and Dr. Vedanarayanan, who has performed studies of snakebite envenomation on human nerves, clearly established that there is no recognized medical or scientific link between copperhead snake venom and polyneuropathy.
¶ 24. Additionally, Texas Gas/Liberty Mutual argues that the medical treatments of immunoglobulin ordered by Dr. Cape are not medically necessary. Texas Gas/Liberty Mutual maintains that in the opinion of Dr. Vedanarayanan, the known side effects of immunoglobulin greatly outweigh the benefits and that risks include morbidity in light of Dabney’s well-known history of cardiovascular disease. Texas Gas/Liberty Mutual further asserts that none of Dabney’s other physicians, including Dr. Morris and Dr. Baxter prescribed any treatments for Dabney for his left leg injury and that the known injury from the snakebite has been fully resolved and has been since July 1993.
¶ 25. Dabney counters that Dr. Cape testified that his condition was related to the snakebite and that the immunoglobulin injections are necessary as treatment for his condition. Dabney asserts that Dr. Cape is his treating physician and that higher credibility and weight is given to *1086 the opinion of a treating physician as opposed to physicians or experts selected by the employer. South Central Bell Telephone Co. v. Aden, 474 So.2d 584, 593 (Miss.1985). Thus, Dabney asserts that he has proven by a preponderance of the evidence that he suffered a work-related injury and that the subsequent medical treatment ordered by Dr. Cape is necessary and reasonable.
¶ 26. The Mississippi Supreme Court has stated that it is not within the authority of a reviewing court to re-weigh the evidence in order to determine whether the preponderance of the evidence “might favor a result that is contrary to the Commission’s determination.” Hollingsworth v. I.C. Isaacs and Co., 725 So.2d 251, 254(¶ 11) (Miss.Ct.App.1998). “So long as there is substantial evidence in the record to support the Commission’s findings, this Court is obligated to affirm the Commission.” Id. at 254-255 (¶¶ 11-12).
¶ 27. In the case sub judice, there is substantial evidence that Dabney’s condition of polyneuropathy was caused by a snakebite and that the immunoglobulin treatments were medically necessary. Dr. Baxter testified to a reasonable degree of medical certainty that Dabney’s condition of neuropathy is secondary to the snakebite. Additionally, Dr. Cape testified that, based on his evaluations and neurologic examinations, Dabney suffered from peripheral polyneuropathy secondary to the snakebite. Dr. Cape also testified that the immunoglobulin treatments were needed to counteract the autoimmune disorders that attack the nerves.
¶ 28. The Mississippi Supreme Court has held that “whenever the expert evidence is conflicting, the court will affirm the Commission whether the award is for or against the claimant.” International Paper, 773 So.2d at 401 (citing Kersh v. Greenville Sheet Metal Works, 192 So.2d 266, 268 (Miss.1966)). “The Commission, as fact finder, is entitled to weigh the competing testimonies and render its decision accordingly, provided that the acceptance of the testimony over that of the other did not result in a decision which was clearly erroneous.” International Paper, 773 So.2d at 402 (citing Baugh v. Central Miss. Planning and Dev. Dist, 740 So.2d 342(¶ 8) (Miss.Ct.App.1999)). Accordingly, we find that there is substantial medical evidence to support the Commission’s decision. We now turn to a discussion of the issues raised in the cross-appeal.
¶ 29. ? In his cross-appeal, Dabney asserts that the previous awards for temporary total benefits and permanent partial benefits were based only upon the initial treatment given by Dr. Morris and were not based upon Dabney’s current condition of polyneuropathy. Dabney maintains that he should be given additional temporary benefits and that the maximum medical improvement should be changed from September 13, 1993, to May of 1999, the date which Dr. Cape testified that Dabney reached maximum medical improvement.
¶ 30. Texas Gas/Liberty Mutual argues that the administrative law judge clearly specified the issues for decision prior to the hearing of May 7, 2002, and that Dab-ney’s new issues were not part of the administrative law judge’s consideration. Texas Gas/Liberty Mutual asserts that Dabney offered no proof whatsoever to address the issues of temporary disability or permanent disability, and therefore, waived any consideration of these issues and any request for additional benefits should be denied.
¶ 31. Dabney counters that both issues of temporary total disability and permanent partial disability benefits were listed *1087 on his pretrial order and that he specifically brought these issues to the attention of both the administrative law judge and Texas Gas/Liberty Mutual’s counsel. Dabney maintains that since the administrative law judge found the testimony of Dr. Cape to be credible on the issue of causation that it was error not to further award disability benefits based upon the additional five percent impairment rating and the additional date of maximum medical improvement as opined by Dr. Cape.
¶ 32. A review of the record reveals that Dabney did in fact list the issues of temporary and permanent disability benefits in his pretrial statement. The record also indicates that at the beginning of the hearing, after the administrative law judge stated the issues to be considered and asked if there were any additions or revisions to anything that she had said, Dab-ney’s counsel responded as follows: “Well, other than if it’s related [the neuropathy to the snakebite], then the MMI and the extra impairment rating of Dr. Cape would have to be considered by the Court.” However, Dabney failed to assert the issue of temporary total disability benefits in his notice of appeal to the circuit court. He appealed only the denial of permanent partial disability benefits. Therefore, Dabney is now proeedurally barred from raising the issue of the denial of temporary total disability benefits. Crowe v. Smith, 603 So.2d 301, 305 (Miss.1992).
¶ 33. Procedural bar notwithstanding, we find no basis for holding the Commission in error for not awarding additional temporary benefits. Dr. Morris, who first treated Dabney for the snakebite, released Dabney to return to work on September 13, 1993, which was also the date of maximum medical improvement. The administrative law judge awarded Dabney temporary total benefits in the amount of $227.18 per week beginning in September 1, 1992, and continuing through September 13, 1993. Dabney was also awarded fifty-two and onehalf weeks of permanent partial disability benefits, at the same weekly rate, based upon a thirty percent impairment rating of the left lower extremity and a maximum medical improvement date of September 13, 1993. There is no direct evidence in the record that the initial maximum medical improvement date was incorrect. It is true that Dr. Cape stated that Dabney reached maximum medical improvement in May 1997. However, Dr. Cape did not start treating Dabney until after the first order was entered in this case setting the maximum medical improvement date of September 13, 1993. That date was set based upon competent medical evidence. At best, Dr. Cape’s testimony represents a conflict in the evidence. It is the prerogative of the Commission to resolve conflicts in the evidence. In this case, it apparently resolved the conflict against Dabney. We find no error.
¶ 34. Turning to Dabney’s other claim that he should have been awarded additional permanent partial benefits, we note that in October 1999, Dr. Cape gave Dabney a five percent impairment rating to the body as a whole. Dr. Cape did not explain why his permanent partial disability impairment rating was not made until approximate two and one-half years after he concluded that Dabney had reached maximum medical improvement. In any event, as previously noted, the Commission had already awarded Dabney fifty-two and a half weeks of permanent partial disability. Dabney asserts that if the Commission believed Dr. Cape with respect to Dr. Cape’s finding that Dabney’s polyneuropa-thy was causally connected to the snakebite, then it should have believed Dr. Cape’s testimony that Dabney has a five percent permanent partial impairment rating. It is well-settled law that a fact- *1088 finder is not obligated to accept a witness’s testimony in toto. Moreover, there is no indication in the record that Dr. Cape was even aware of the prior permanent partial disability rating, and if so, whether that fact impacted the rating given by him. We affirm the decision of the Commission denying additional permanent partial disability benefits.
¶ 35. The separate opinion, which dissents from our decision affirming the Commission’s finding that Dabney’s polyneuro-pathy was caused by snakebite misquotes the discharge summary and distorts the facts by selecting and blending disjointed statements from both the “Discharge Summary” and the “History and Physical Examination.” Additionally, the entire premise of the separate opinion is that Dr. Cape’s testimony should be discounted because his opinion, that Dabney is suffering from polyneuropathy, is predicated upon the assumption that the history that Dab-ney gave him was true when in fact that history was untrue. Specifically, the separate opinion contends that the “medical records of the initial hospitalization, beginning on September 1, 1992, states Dabney complained of peripheral neuropathy type symptoms upon admission and further admitted that this was a chronic condition which occurred prior to September 1, 1992.”
¶ 36. The separate opinion’s assertion that the initial medical records indicate that Dabney suffered from a chronic condition of peripheral neuropathy type symptoms prior to September 1, 1992, is simply untrue and is not supported by the record. On the morning of September 1, 1992, after Dabney suffered the snakebite, he first saw Dr. Malcolm Baxter, his regular physician, who treated Dabney and referred him to Baptist Memorial Hospital DeSoto. Dr. Baxter’s notes for that visit indicate that Dabney felt numb all over and had numbness in his left hand and arm.
¶ 37. Baptist Memorial Hospital records indicate past and present histories for Dabney on the admission date of September 1. I quote those histories in their entirety:
HISTORY OF PRESENT ILLNESS: Mr. Dabney is a 57 year-old white male with a history of coronary artery disease (status post myocardial infarction times two). He also has a history of mitral regurgitation that has been fairly stable up until now. He denies any recent exercise induced chest pain. Apparently, he was at work today when he developed acute onset of diaphoresis with associated nausea, vomiting, and shortness of breath. He also had a pressure like sensation in his chest. This has continued up until he came to the emergency room. He also experienced some numbness in his left arm and two fingers on the left side. He has a history of chronic two pillow orthopnea. Does have occasional paroxysmal nocturnal dyspnea and pedal edema. His edema is usually on the left side associated with old injuries. He denies any palpitations.
PAST MEDICAL HISTORY: Significant for coronary artery disease, hypertension, peptic ulcer disease with gastrointestinal bleed, status post partial gastrectomy and vagotomy. He has a history of colon polyps with recent colon bleeding. He is over due for colonosco-py. History of hyperlipidemia. No history of diabetes, appendectomy, status post trauma to his left leg with multiple surgeries and residual swelling, status post surgery of his right shoulder. He is allergic to Codine.
¶38. The hospital records for the admission date of September 1 also indicate under the category, “Physical Examination,” the following observations:
*1089 NEUROLOGIC: He does have some swelling of his left lower extremity compared to the right. This is chronic by history. Good distal pulses. Deep tendon reflexes are 1 to 0 throughout and bilaterally symmetrical. There is no Ba-binski sign.
ASSESSMENT: 1. Chest pain, rule out myocardial infarction, rule out unstable angina
[[Image here]]
10. Chronic left leg swelling secondary to trauma
[[Image here]]
13. Status post cholecystectomy
14. Status post appendectomy
15. Status post left leg surgery and right arm surgery
¶ 39. The hospital’s discharge summary record indicates the following:
HOSPITAL COURSE: Patient was admitted to Baptist Memorial Hospital De-soto with a diagnosis of chest pain, possible transient ischemic attack.... He was also complaining of some peripheral neuropathy like symptoms and B-12 and Folate levels were done. He was found to be B-12 deficient. This was felt to be secondary to partial gastrectomy and he required B-12 supplementation which was instituted during this admission....
¶ 40. The admission and discharge summaries clearly demonstrate that there is no basis in the medical records for the separate opinion’s assertion that Dabney had chronic peripheral neuropathy type symptoms prior to September 1, 1992. It is also clear that upon admission, Dabney had some numbness in his left arm and two fingers on the left side as reflected in the “History of Present Illness.” It is not entirely clear whether the statement in the discharge summary under “Hospital Course”' — that “[h]e was also complaining of some peripheral neuropathy type symptoms” — refers to complaints made at the time of admission or to complaints during the course of Dabney’s hospital stay. It would seem logical, however, that the reference is to complaints made during the course of the hospital stay since it is included in the discharge summary under the heading “Hospital Course” and is not included in the “History of Present Illness” which was taken upon admission. Nevertheless, whether the statement refers to complaints made at the time of admission or to complaints made during the course of Dabney’s hospital stay is largely academic because, in any event, when Dabney was admitted to the hospital, he had already been bitten by the snake. Also Dr. Baxter’s testimony makes it exceedingly clear that Dabney had not experienced any type peripheral neuropathy or neural problems prior to the snake bite.
¶ 41. The separate opinion also makes the assertion that “[d]espite what Dabney told Dr. Cape, the substantial medical evidence indicates that Dabney did not have leg numbness or neurological complaints to his lower extremities (other than ones already present) until Dabney started seeing Dr. Cape three and one-half years later in July 1995.” Again, this statement is not an accurate reflection of what the record reveals. As we have already pointed out, the discharge summary indicates that Dab-ney was complaining of peripheral neuro-pathy-like symptoms during his hospital stay for the snakebite. Further, Dr. Baxter’s medical notes of November 2, 1992, indicate that Dabney was seen for “followup with hypertension and cellulitis of his left lower leg.” And again on November 13, 1992, Dr. Baxter’s notes indicate “follow-up with hypertension and snakebite with secondary cellulitis of his lower leg. Leg is still draining.” During Dr. Baxter’s deposition, he made it clear that, in hindsight, he thought that Dabney’s peripheral *1090 neuropathy began January 8, 1993, although at the time of the initial treatments he did not make that diagnosis. On this point, the record reflects the following:
Q. If we are talking about the same thing, I guess my question originally was what was the first incidence where you yourself diagnosed a—
A. Peripheral polyneuropathy?
Q. —peripheral polyneuropathy? Yes, sir.
A. I’ve got an office note here on December 4, '92, where he had rash on his arms and legs. I thought at that time, that was scabies, but that could have been an allergic reaction from the snakebite. He continued to have a cellulitis of his left lower leg on January 8, '93, so I would have to say—
Q. Maybe my question is not clear or we are not communicating.
A. I’m calling it cellulitis, but it might have been the beginnings. That’s what I would term the beginnings of this neuropathy.
Q. Let me try it one more time. Let’s clear that up. What is the difference between cellulitis and a peripheral polyneuropathy?
A. Cellulitis is an infection; and he had redness and swelling and heat, which is an indication of cellulitis. But that can also be the beginnings of a neuropathy.
Q. What did you diagnose on that day of December 2,1992?
A. Scabies.
Q. Are you changing that diagnosis now?
A. No.
Q. Let me, again, I guess, repeat my question. Let me back up one more time. What was the first date, as his family physician, you diagnosed Mr. Dabney with peripheral poly-neuropathy?
A. I would say it’s not documented in the chart, but I would say the very beginnings of it was January 8, 1993. Looking at the chart and knowing his history and knowing all the circumstances, I would say that that was the beginnings; although, neuropathy was not mentioned in that note.
¶ 42. The separate opinion also incorrectly asserts that “Dr. Cape testified that there were numerous medical textbooks which established a link between snake venom and polyneuropathy. However, Dr. Cape could not identify [or] recall any such texts or authority during his deposition.” While Dr. Cape did testify that there were numerous medical texts that support his opinion that snake venom can cause neuro-pathy, the record, as revealed in the following colloquy, belies the assertion that he could not name a single text:
Q. All right. You have mentioned a medical text that have [sic] supporting information in there that a snake then can cause neuropathy; can .you refer me to the medical text?
A. I’m doing this free, I’ll let you look that one. It’s different texts. I’ll let you look them up.
Q. I’ll be happy to do that if you will tell me the name of the text?
A. Peter Dyck, D Y C K.
Q. That’s the name of the author?
A. Right.
Q. And the text is called polyneuropa-thy?
A. Well purpura polyneuropaty[sic],
¶ 43. The separate opinion points out that there are “twelve known risk factors, symptoms or pre-existing medical condi *1091 tions which the medical community and authoritative text recognize as a cause of polyneuropathy”... and that “Dabney’s medical records and testimony revealed he had other pre-existing and other medical conditions which are not related to his employment.” Apparently, the purpose of this observation is to suggest that Dab-ney’s polyneuropathy may have been caused by one of these other conditions. The record speaks to this point in a colloquy between counsel for Texas Gas/Liberty Mutual:
Q. Okay. Doctor, for the dozen or so known causes for neuropathy that you mentioned and the, I don’t know, six or seven that Mr. Dabney either had before he came to you or had and developed while you were treating him, isn’t it true that his polyneuropathy as well as autoimmune neuropathy could have been caused by one of these other conditions?
* * *
A. It could have been caused by an unknown autonomic neuropathy that I wasn’t aware that he had, yes, but not the other conditions we mentioned, no.
Q. Are you available to state to a reasonable degree of medical certainty that the snakebite is what caused the neuropathy if the other conditions could have caused it, could have been the snakebite or could have been one of these or could have been one of those?
A. Yes, I am.
Q. And it’s still your opinion that the snakebite is what—
A. (Interposing.) Using historical information and ruling out other causes and as far as his neuropathy and his subsequent treatment, I believe that’s the most likely etiology at this case, and I can’t hundred percent exclude other causes because I didn’t find a definite etiology. It’s by exclusion that I come to this, plus the historical event he had the snake bite and the next day he had the numbness or close to that.
Q. If he had not had the numbness the day after the snake bite—
A. (Interposing.) If he had it weeks or months later, I probably wouldn’t have related it to that.
Q. Did you rule out and exclude these other conditions we talked about, the B12 and the nutritional problem, the stomach remove and diabetes?
A. Well, I treated him, and it made no difference in his symptoms.
¶ 44. Finally, the separate opinion extols the evidential virtue of the testimony of Drs. Yedanarayanan and Carlton and Mr. Vandeventer who never saw and treated Dabney. It is sufficient to say that this case presented the classical dual between the experts. The Commission is the fact-finder. It chose to accept and credit the testimony of Dabney’s treating physicians, including Dr. Cape, over the testimony of these individuals who never treated Dab-ney.[2] We are duty bound to defer to the findings of the Commission if there is substantial evidence to support its findings.
¶ 45. THE JUDGMENT OF THE CIRCUIT COURT OF DESOTO COUNTY IS AFFIRMED ON BOTH DIRECT AND CROSS-APPEAL. COSTS OF *1092 THIS APPEAL ARE ASSESSED ONE-HALF TO THE APPELLANT AND ONE-HALF TO APPELLEE.
KING, C.J., LEE, P.J., MYERS, CHANDLER, BARNES, AND ISHEE J., CONCUR. GRIFFIS, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION JOINED BY BRIDGES, P.J.

. In order to present a comprehensive view of the evidence available to the Commission, we discuss Dabney’s medical history and treatment beginning with the treatment following the snakebite even though much of this medical treatment was rendered prior to the initial determination that Dabney suffered a com-pensable injury as a result of the snakebite.

. At the time his deposition was taken, Dr. Cape had taught neurology for thirty-six years. He is certified by the American Board of Psychiatry and Neurology and the American Society of Neurorehabilitation. He holds a medical license in the states of Mississippi, Tennessee, Arkansas, North Carolina, Iowa, and Kentucky.